

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00115-CR

JOE ANGEL MORIN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

----------

### FROM COUNTY COURT AT LAW NO. 2 OF PARKER COUNTY
### TRIAL COURT NO. CCL2-16-0173

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant Joe Angel Morin appeals his conviction for driving while intoxicated. In four points, Morin argues that the trial court reversibly erred by overruling his objection to the arresting officer's testimony wherein the officer correlated Morin's performance on the walk-and-turn test to a specific blood-

---

[1]See Tex. R. App. P. 47.4.

alcohol concentration (BAC); that the trial court reversibly erred by allowing the State's expert to testify to a retrograde extrapolation of Morin's BAC at the time the officer encountered him; and that the trial court erred by allowing the State to erase diagrams from a dry-erase board utilized during the expert's testimony. Because we conclude that the trial court's allowance of the correlative testimony was harmless, that there are sufficient indicia of reliability to support the expert's testimony regarding retrograde extrapolation, and that the trial court did not err by allowing the State to erase the dry-erase board that was used as a demonstrative aid, we will affirm.

## II. BACKGROUND

Texas Highway Patrol Trooper Ty McLaughlin testified that on January 7, 2016, at roughly 8:20 p.m., he was driving down Farm-to-Market 113 when he noticed headlights on Bennett Road, which is a two-lane, unmarked road. Noticing that the vehicle was stationary as he passed, McLaughlin averred that he turned around to check on whether the driver of the vehicle needed assistance. As he approached, McLaughlin said that he observed a pickup truck "sitting still in the roadway." According to McLaughlin, a lone man, later identified as Morin, was sitting in the driver's seat. McLaughlin said that he could smell an odor of alcohol emitting from the truck as he approached the driver's side door and as Morin rolled down his window. The truck's being parked in the middle of a traffic lane and the odor of alcohol led McLaughlin to suspect that Morin might be intoxicated.

2

McLaughlin said that he asked Morin questions about why he was parked in the roadway and that Morin stated he was watching a movie on his phone. McLaughlin also said that Morin seemed unconcerned about being parked in the middle of his lane and expressed that "there wasn't much traffic." McLaughlin testified that he noticed that Morin had slurred speech and glassy eyes. McLaughlin averred that after he asked for Morin's license, Morin struggled "a little bit" producing it. McLaughlin asked Morin to step out of the truck. McLaughlin said that he could then smell alcohol emitting from Morin's breath and body and that it appeared that Morin had urinated in his pants. So McLaughlin asked Morin to step between McLaughlin's patrol vehicle and the truck for safety purposes. According to McLaughlin, Morin was "very unsteady" and had to stay "real close to his truck . . . for balance." McLaughlin said that he then asked Morin how much he had drank that night. Morin responded that he had drank a beer and some wine approximately an hour and a half prior to McLaughlin's arrival. McLaughlin averred that he asked Morin whether he had any open containers in his truck, which Morin denied. But McLaughlin said that he later discovered an open bottle of wine near where Morin's leg would have been when he was seated in the truck; a small, opened bottle of Jim Beam whiskey sitting on the console; a few unopened beers in the cab of the truck; and more unopened beers in an ice chest that was in the back of the truck.

Given his observations of what he believed to be signs that Morin was intoxicated, McLaughlin said that he then conducted field-sobriety tests.

3

McLaughlin averred that Morin displayed six out of six clues on the horizontal-gaze-nystagmus test, eight out of eight clues on the walk-and-turn test, and three out of four clues on the one-legged-stand test. In response to the prosecutor's inquiry of what the eight clues on the walk-and-turn test indicated, McLaughlin said, "That the BAC . . . is above a 0.08." Morin objected to this statement, and the trial court overruled his objection. The prosecutor then again asked McLaughlin what a total of eight clues indicated, and McLaughlin said that it meant that Morin had "lost the use of his normal physical and mental faculties and [was] probably unable to operate a motor vehicle on a public roadway." McLaughlin averred that given the totality of the circumstances, he believed Morin was intoxicated and therefore arrested him. After the arrest, McLaughlin drove Morin to the station and administered two breathalyzer tests, the first around 9:54 p.m. and the second two minutes later.

The State introduced, the trial court admitted, and the State published a video from McLaughlin's patrol vehicle's camera. In the video, as McLaughlin questioned Morin about why he was parked in the middle of his lane and whether he had any alcohol to drink that day, Morin's words were greatly slurred. When Morin exited the truck and attempted to walk toward the back of it, he consistently placed his hand on the bed of the truck to keep his balance. At one point in the video, McLaughlin asked Morin if there were any open containers in the truck, and Morin stated, "I'm gonna show you." McLaughlin then told Morin to stay where he was and just tell him, but Morin appeared not to have heard

4

McLaughlin and began to walk to the cab of his truck.  McLaughlin then stated multiple times to stay right there.  McLaughlin also asked how much of the wine he had drank, and Morin stated, "I just had a little swig of it."  As McLaughlin administered field-sobriety tests, Morin lost his balance numerous times, failed to follow instructions, asked McLaughlin to repeat himself, and appeared to be confused by McLaughlin's instructions.  When McLaughlin asked Morin whether he knew his ABCs, Morin immediately started rambling the alphabet with slurred speech but did not get past several letters, most of which were incoherent.  At one point in the video, Morin stated that he was "buzzed" and that on a scale of zero to ten, he was intoxicated to a level of three.

Steve Kleypas, a technical supervisor who oversees the breath-alcohol testing program for Parker County, testified about how breathalyzers work in general and the results of McLaughlin's testing of Morin.  As Kleypas explained the science behind breathalyzers, the prosecutor utilized a dry-erase board as a demonstrative aid to illustrate what Kleypas was averring to.  Morin objected to the use of the dry-erase board, contending that he would need a record of what the prosecutor drew for purposes of appeal.  The trial court denied Morin's objection.  Kleypas averred that the results of the two breathalyzer tests that McLaughlin administered to Morin were BAC levels of 0.086 and 0.088.

Over Morin's objections, Kleypas also estimated that if Morin had imbibed one beer and a "swig" of wine an hour and a half before McLaughlin encountered him at 8:20 p.m. and then Morin blew 0.086 and 0.088 two minutes apart at

5

roughly 9:54 p.m., his BAC would have been between 0.09 and 0.11 at 8:20 p.m. As Kleypas testified regarding retrograde extrapolation, the prosecutor again used the dry-erase board to diagram Kleypas's testimony. Before the prosecutor began to diagram, he erased what had been drawn previously regarding Kleypas's testimony about breathalyzers. Morin objected, and the trial court overruled his objection. Using the dry-erase board again, as Kleypas explained the concepts of absorption of alcohol, peak absorption, and the body's alcohol-elimination rate, the prosecutor drew a diagram on the board. Morin again objected and asked that the drawing be made part of the record. The trial court again overruled his objection.

During direct and cross-examination, Kleypas explained that he was speaking in generalities and what would be possible for the average person regarding extrapolation or absorption of BAC but said that things like food, pace of drinking, a person's weight, and other variables would impact a person's alcohol-absorption rate. Thus, Kleypas averred, instead of using a standard average of 0.02 BAC absorption rate after peak intoxication, he took into account these other possible variables and utilized a range of 0.01 to 0.03 BAC absorption rate in arriving at his opinion that Morin's BAC would have been between 0.09 and 0.11 at 8:20 p.m.

Morin called his sister, Nikki Ruiz, in his defense. According to Ruiz, Morin suffered two strokes during April of 2015. She also said that she was one of his caregivers when he came home after his second stroke. By Ruiz's account,

6

Morin's speech was greatly affected by the strokes because he now slurs his speech and is difficult to hear and understand. She also said that he now experiences problems swallowing food and has a faulty memory.

A jury returned a guilty verdict, and the trial court sentenced Morin to 180 days in jail and a $1,000 fine. The trial court then suspended the imposition of the jail sentence and placed Morin on community supervision for twenty-four months. This appeal followed.

### III. DISCUSSION

### A. McLaughlin's Testimony Correlating Performance with BAC

In his first point, Morin argues that the trial court erred by overruling his objection to McLaughlin's testimony that Morin's having exhibited all eight cues on the walk-and-turn test correlated to a BAC above 0.08. The State concedes this point but argues that the error was harmless. We agree with the State that the error was harmless in this case.

It is generally impermissible for a witness in a DWI case to correlate a defendant's BAC with the defendant's performance on field-sobriety tests. *See Emerson v. State*, 880 S.W.2d 759, 769 (Tex. Crim. App.), *cert. denied*, 513 U.S. 931 (1994) (holding that it was error for police officer to correlate results of HGN test with a specific BAC); *see also Lorenz v. State*, 176 S.W.3d 492, 496 (Tex. App.—Houston [1st Dist.] 2004, pet ref'd) (discussing *Emerson's* applicability in the context of multiple field-sobriety tests). Such an error is a non-constitutional error, and we apply rule 44.2(b) and disregard the error if it did not affect Morin's

substantial rights. *See* Tex. R. App. P. 44.2(b); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

Here, the State introduced evidence that Morin had blown a 0.086 and 0.088 BAC on the two breathalyzer tests that McLaughlin administered. Furthermore, McLaughlin testified that when he encountered Morin, Morin's eyes were glassy, his speech was slurred, he smelled of alcohol, and he appeared to have urinated on himself. It is also relevant that Morin was parked in the middle of his lane, watching a movie on his phone, and his excuse was that there was little traffic. Moreover, McLaughlin testified that he discovered an open container in the truck just after having Morin step out of the truck. McLaughlin also testified that Morin had failed all field-sobriety tests. And the jury observed video footage showing that Morin lacked balance, slurred his speech, could not comprehend McLaughlin's instructions, admitted to being "buzzed," and performed terribly on

the field-sobriety tests. Given the weight of evidence before the jury, we conclude that McLaughlin's testimony correlating Morin's performance on the walk-and-turn test with a specific BAC did not influence the jury, or had but a slight effect. *See Smith v. State*, 65 S.W.3d 332, 345 (Tex. App.—Waco 2001, no pet.) (holding officer's testimony correlating performance on HGN test with a specific BAC harmless where breathalyzer results showed above 0.08 BAC and there was testimony the defendant "smelled of alcohol, [had bloodshot eyes], and failed field sobriety tests"). We overrule Morin's first point.

## B. Retrograde-Extrapolation Testimony

In his second point, Morin argues that Kleypas did not have sufficient data to reliably perform a retrograde extrapolation given the facts of this case and that the admission of his opinion violated the court of criminal appeals' decision in *Mata v. State*. 46 S.W.3d 902, 916 (Tex. Crim. App. 2001). We disagree.

With regard to the *Mata* factors of reliability, a court evaluating the reliability of a retrograde extrapolation should consider (a) the length of time between the offense and the tests administered; (b) the number of tests given and the length of time between each; and (c) whether, and if so, to what extent, any individual characteristics of the defendant were known to the expert in providing his extrapolation. *Id.* Some of these characteristics include, but are not limited to, the person's weight, gender, typical drinking pattern, tolerance for alcohol, amount of alcohol consumed, what the person ingested, the duration of the drinking spree, the time of the last drink, and how much and what the person

had to eat either before, during, or after the drinking. *Id.* The *Mata* court gave the following guidelines when balancing the factors:

> If the State had more than one test, each test a reasonable length of time apart, and the first test were conducted within a reasonable time from the time of the offense, then an expert could potentially create a reliable estimate of the defendant's BAC with limited knowledge of personal characteristics and behaviors. In contrast, a single test conducted some time after the offense could result in a reliable extrapolation only if the expert had knowledge of many personal characteristics and behaviors of the defendant. Somewhere in the middle might fall a case in which there was a single test a reasonable length of time from the driving, and two or three personal characteristics of the defendant were known to the expert.

*Id.* at 916–17.

Here, McLaughlin administered the breathalyzer tests approximately one hour and thirty-five minutes after he encountered Morin. The tests themselves occurred only a few minutes apart, at roughly 9:54 p.m. Kleypas testified that he considered the following factors when calculating Morin's BAC at the time McLaughlin encountered him: (1) Morin last imbibed alcohol an hour and a half before McLaughlin encountered him at 8:20 p.m.; (2) at the time he last drank, Morin admittedly imbibed one beer and a "swig" of wine; (3) Morin was last seen operating his truck at 8:20 p.m.; and (4) breathalyzer results occurred roughly two minutes apart at roughly 9:54 p.m.

Because the breathalyzer tests were given within minutes of each other, the circumstances of the present case are most like a situation where a single breathalyzer test has been given. *See id.* The tests were given within a

reasonable amount of time after McLaughlin encountered Morin, and Kleypas knew more than two personal characteristics (including knowing that he is a male) about Morin.

Morin argues that the results are not reliable because Kleypas did not consider other factors—ostensibly, because he does not specify what factors—his weight, his drinking pattern on that night, the exact amount of food in his stomach, the precise number of drinks Morin had consumed (aside from the one beer and swig of wine he admitted to drinking), and exactly when he began and when he stopped drinking. But many of these more specific characteristics were unnecessary because Kleypas used a broad-range rate for elimination of alcohol, between 0.01 and 0.03, instead of calculating a specific elimination rate for Morin. *See Smothers v. State*, No. 2-03-056-CR, 2004 WL 1597652, at *5 (Tex. App.—Fort Worth July 15, 2004, no pet.) (not designated for publication) (holding that retrograde-extrapolation testimony was reliable where expert used standard-elimination rate instead of an individualized rate and knew the time of defendant's last drink, the time of traffic stop, and the time and results of two breathalyzer tests administered three minutes apart an hour and forty-five minutes after stop). We hold that under the circumstances, Kleypas considered enough characteristics that his testimony was sufficiently reliable.

Moreover, we note that Kleypas's retrograde-extrapolation testimony was not required in order to admit the breathalyzer tests' results in this case because other evidence, as discussed above, proved beyond a reasonable doubt that

11

Morin was intoxicated when McLaughlin encountered him. *See Forte v. State*, 707 S.W.2d 89, 94–95 (Tex. Crim. App. 1986) (holding that defendant committed DWI offense without consideration of extrapolation evidence); *Price v. State*, 59 S.W.3d 297, 300 (Tex. App.—Fort Worth 2001, pet. ref'd) (holding that extrapolation is not required if other evidence proves intoxication beyond a reasonable doubt). Accordingly, we hold that the trial court did not err by admitting the complained-of testimony. Morin's second point is overruled.

## C. The Prosecutor's Erasure of the Dry-Erase Board

In his third and fourth points, Morin argues that the trial court erred by allowing the prosecutor to erase from the dry-erase board both of the diagrams that were drawn during Kleypas's testimony. We note that when the trial court overruled Morin's objections to the erasure, the trial court noted that the diagrams were not admitted into evidence but were merely demonstrative aids to help the jury understand the testimony. We agree with the trial court's reasoning.

It is proper to allow a witness "to demonstrate before the jury so as to make more plain and clear her testimony." *Lewis v. State*, 486 S.W.2d 104, 106 (Tex. Crim. App. 1972). The trial court has discretion on whether demonstrations should be permitted. *Ginther v. State*, 672 S.W.2d 475, 477 (Tex. Crim. App. 1984). And it is not an abuse of discretion for the trial court to allow the utilization of demonstrative aids that are not admitted into evidence, not seen again by the jury, and not made a part of the record. *See Henricks v. State*, 293 S.W.3d 267, 276 (Tex. App.—Eastland 2009, pet. ref'd) (holding that trial court did not abuse

12

discretion by allowing witness to utilize a PowerPoint presentation that was not entered into evidence).

Here, the trial court did not abuse its discretion by allowing the prosecutor to diagram Kleypas's testimony on the dry-erase board as a demonstrative aid to the jury. The trial court likewise did not abuse its discretion by not admitting these diagrams into evidence and thus not making them part of the record. We overrule Morin's third and fourth points.

## IV. CONCLUSION

Having overruled all four of Morin's points on appeal, we affirm the trial court's judgment.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: WALKER, MEIER, and KERR, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 9, 2018